UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| TRUSTEES OF THE MICHIANA AREA ELECTRICAL WORKERS HEALTH AND WELFARE FUND, TRUSTEES OF THE MICHIANA AREA ELECTRICAL WORKERS PENSION FUND, MICHIANA AREA WORKERS MONEY PURCHASE PLAN,<br><br>    Plaintiffs,<br><br>    v.<br><br>TGB UNLIMITED INC. d/b/a S/T BANCROFT ELECTRIC and WEST BEND MUTUAL INSURANCE COMPANY,<br><br>    Defendants. | CAUSE NO.: 2:15-CV-446-TLS |

**OPINION AND ORDER**

This matter is before the Court on the Motions for Summary Judgment [ECF Nos. 35, 37] filed by the Plaintiffs, Trustees of the Michiana Area Electrical Works Health and Welfare Fund, Trustees of the Michiana Area Electrical Workers Pension Fund, and the Michiana Area Workers Money Purchase Plan (the "Trustees" and the "Funds"), and the Defendants, TGB Unlimited ("TGB") d/b/a S /T Bancroft Electric ("Bancroft Electric") and West Bend Mutual Insurance Company ("West Bend"). The Plaintiffs are seeking unpaid contributions by TGB to the Funds, under the Employment Retirement Income Security Act (ERISA), as well as a judgment against West Bend as a surety of Bancroft Electric's contractor's bond. Both Motions were filed on January 27, 2017. This matter is now fully briefed and ripe for ruling.

**BACKGROUND**

The Plaintiffs are Trustees of the Funds. They filed this lawsuit against the Defendants under section 502(a)(3), (e)(1), and (f) of ERISA, 29 U.S.C. §§ 1132(a)(3), (e)(1) and (f), seeking unpaid fund contributions from TGB. In 2007, TGB entered into a business relationship with the Funds and the International Brotherhood of Electrical Workers Local 153 ("Local 153"), in which TGB would use Local 153 labor and in return, among other obligations, pay contributions to the Funds. Local 153 and the Funds maintained their relationship until 2015, after a series of events involving former Local 153 members Doug and Cody Curl resigning their union membership for another union. The Curls resigned their memberships in October and December 2014. They continued to work for TGB, but TGB stopped paying contributions on their behalf. And during this time, TGB continued to employ a Local 153 member and continued to pay contributions for him.

In March 2015, the Trustees sent a letter to TGB through the Northern Indiana Chapter of the National Electrical Contractors Association ("N.E.C.A."), a not-for-profit association representing electrical contractors in labor issues, extending a grace period for late payment of contributions. (Grace period letter, ECF No. 36-18.) On March 20, 2015, Local 153 filed a grievance relating to TGB's failure to pay contributions. TGB countered by filing an NLRB RM petition on March 25, 2015. (NLRB RM 1, ECF No. 36-25.) In the petition, TGB asserted that Local 153 was a recognized bargaining agent, and that "United Construction Workers Local 10, CLA" claimed recognition. *Id.* Thereafter, Local 153 disclaimed interest in representing TGB employees in an April 2, 2015 letter, which ended the grievance and RM petition. Upon the termination of the contractual relationship, Local 153 requested that the auditor for the Fund's third-party administrator, TIC International Corporation ("TIC"), conduct an exit audit. TIC

calculated contributions on behalf of the Curls from October 2014 through the effective date of Local 153's letter disclaiming interest in 2015. Bancroft disputed the audit results, claiming that the Curl's resignation from Local 153 relieved TGB of the obligation to pay contributions.

The following summarizes the relevant agreements between the parties, the accounting of the liability, damages alleged, and liability over a contractor's bond.

**A.     The Agreements**

Local 153 and TGB first entered into a contractual relationship in 2007. Among other documents, the parties entered into an Assent of Participation Agreement. The Assent of Participation Agreement is signed by the employer and designates the Funds to accept contributions on behalf of Local 153 employees. Under the Assent of Participation Agreement, the employer's obligation to pay contributions continues unless each of the Funds' board of trustees receives notice of termination of the Assent of Participation Agreement or until a related Collective Bargaining Agreement ("CBA") is nullified between the employer and Local 153.

There are two CBAs of significance in this matter. The first had an effective date of June 6, 2011, and expired on June 3, 2012. (2011–12 CBA, ECF No. 36-23,) The second had an effective date of March 1, 2012, and expired on May 31, 2015. (2012–15 CBA, ECF No. 36-24.) The validity of this last CBA is disputed here because neither party has produced a signed copy.

TGB also entered into various trust agreements with the Funds: The Agreement and Declaration of Trust for the Michiana Area Electrical Workers Health & Welfare Fund [ECF No. 36-20], the Agreement and Declaration of Trust for the Annuity Fund/Money Purchase Plan [ECF No. 36-21], and the Declaration of Trust of the Michiana Area Electrical Workers Pension Fund [ECF No. 36-22] (the "Trust Agreements"). The Trust Agreements are the governing documents for the administration of the Funds.

Lastly, the parties also signed the Collection Policy of the Michiana Area Electrical Workers Health & Welfare, Pension and Annuity Benefit Funds (the "Collection Policy") [ECF No. 11]. The Collection Policy was created by all three of the Funds, and provides, among other things, an audit procedure and billing procedure.

**B.     Collection of Payments and Payroll Audit**

Collections for the Funds are carried out by the N.E.C.A. As part of its collection process, the N.E.C.A accepts employer payroll reports of hours worked by employees. The employer payroll reports provided to the N.E.C.A office reflect Fund contributions required to be made under the Local 153 Inside Agreement, a subsection of the CBA.[1] TGB paid some contributions owed under the 2012–15 CBA for January, February, March, and the beginning of April 2015, as well as for 2013 and 2014. It paid all contributions required for 2012. TGB also made payments under the 2011–2012 CBA for the first two months of 2012.

Local 153 sent a disclaimer of interest letter dated April 2, 2015, to end TGB's obligation to pay contributions to the Funds. Mike Compton, Chief Officer of Local 153, also contacted TIC, informing it of the union's disclaimer of interest and requesting it perform an exit audit.

TIC, in turn, conducted an audit (the "Audit Report") [ECF No. 36-18]. When TIC reviewed the payroll records at TGB's place of business for the audit period of 2014–2015, it noted that all of the work that the employer recorded was for work under the Inside Agreement of the CBA. TIC's audit results are reflected in a revised billing letter with attached discrepancy information and audit report for the period of January 2014 through April 2015. TIC identified differences in amounts paid and amounts owed in the report. It noted that starting in October and December of 2014, two employees that Bancroft had previously paid contributions for under the

---

[1] The Inside Agreement is part of the 2012–15 CBA. (2012–15 CBA §§ 5.01–5.16.)

CBA (Doug and Cody Curl) had continued to work for the contractor, but no contributions were paid in that period. Even though employees may drop their affiliation and, thus, no longer must pay union dues, the employer is still required to pay the contributions under the terms of the 2012–15 CBA.

Upon receipt of the audit, Ty Bancroft disputed the results and asked whether TIC followed the standard audit process. (Steven Homer Dep. 41, ECF No. 36-4.)

**C.    Damages**

The Trustees seek contributions owed as listed in the Audit Report, liquidated damages under the Collection Policy, the cost of the payroll audit, and attorney's fees.[2] TIC has established the amounts claimed by the Plaintiffs for contributions owed as listed in the Audit Report, totaling $36,164.40. (Audit Report 1.) In addition to contributions due to the Funds, under the Collection Policy, the Trustees are entitled to interest and liquidated damages, if successful. (2012–15 CBA § 9.04.) The Plaintiffs may also claim costs of the payroll audit under the Collection Policy when delinquencies are more than $1,000.00. (Collection Policy 4, ECF No. 36-11.) The cost of the audit was $514.30. (Cost of Audit Email 1, ECF No.36-17 )

**D.    Contractor's Bond**

As part of TGB's obligations under the agreements, Local 153 requires a contractor's bond (the "Contractor's Bond"). TGB maintains its Contractor's Bond with West Bend. TGB's Contractor's Bond requirement goes back to its consent to be bound by the Assent of Participation Agreement. The Contractor's Bond's priority is to pay wages owed and then fund

---

[2] The Trustees note that if they are successful in this action, Doug and Cody Curl will receive contributions from a money purchase plan with direct access to those funds. Contributions paid would allow healthcare eligibility to be restored for the relevant months in 2014 and 2015 so that any claims would be paid. Because the Curls have vesting pensions, they are eligible for pension benefits too.

5

contributions for the worker's benefit. TGB's Contractor's Bond with West Bend has an "evergreen clause" that automatically renews annually.[3] If West Bend pays a claim on the Contractor's Bond, TGB must repay West Bend the amount it paid plus attorney fees and costs of collection.

A representative of West Bend investigated the bond claim by leaving a message with a Local 153 representative and speaking with Ty Bancroft. Bancroft told the representative that TGB was looking to break ties with Local 153 and that their employees were leaving the union. TGB did not want West Bend to pay out the bond proceeds at that time. The representative corresponded with Bancroft in follow-up emails, confirming that West Bend would not pay bond proceeds because of the ongoing dispute. It is West Bend's policy not to pay bond proceeds if the principal advises it has a dispute against the claim.

## STANDARD OF REVIEW

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is the moment in litigation where the non-moving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. A court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir.

---

[3] The bond amount was twice reduced through a rider. The effect of the bond reduction is that TGB pays less premium for the financial guaranty.

1994). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

## DISCUSSION

In 1980, Congress made amendments to ERISA because "delinquencies of employers in making required contributions are . . . a serious problem for many multiemployer plans[.]" *Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148 (7th Cir. 1989). "Sound national pension policy demands that employers who enter into agreements providing for pension contributions not be permitted to repudiate their pension promises." *Id.* As a result, ERISA requires employers to make contributions on behalf of the employees covered by a CBA and requires employers to adhere to the contract terms. *Cent. States, Se. & Sw. Areas Pension Fund v. Hartlage Truck Serv.* Inc., 991 F.2d 1357, 1360 (7th Cir. 1993). Benefit funds may be considered third-party beneficiaries of a collective bargaining agreement or other agreement. *Robbins v. Lynch*, 836 F.2d 330, 333 (7th Cir. 1988). Funds have an independent statutory right under § 1145 to enforce employer contributions under a CBA. *Gerber Truck Service, Inc.*, 870 F.2d at 1152–56. Furthermore, benefit plans must be able to rely on the contribution promises of employers because plans must pay out to beneficiaries whether or not employers live up to their obligations. *Id.* at 1151.

### A. TGB's Obligation to Contribute to the Funds

TGB signed an Assent of Participation Agreement in 2007, in which it agreed to accept and be bound by the corresponding agreements with Local 153 and the Trustees. In the April 2, 2015 letter, Local 153 notified TGB that it disclaimed interest in continuing to represent TGB's employees. The Trustees argue that this notification terminated TGB's obligation to pay contributions to the Funds; no termination event occurred before it. Several months before Local 153's disclaimer of interest, in October and December 2014, two TGB employees, Doug and Cody Curl, resigned their Local 153 membership. But TGB continued to employ the Curls after it ceased paying Fund contributions for them as it also continued to employ another Local 153 member and also paid Fund contributions for him.

Under ERISA,

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. The Assent of Participation Agreement states:

> [C]ontributions shall commence forthwith, if they have not already commenced, and shall continue for a period provided in this and in such agreements, including all amendments, supplements, modifications, extensions, renewals, or successor agreements thereto, and shall continue thereafter until the Board of Trustees of the Welfare Fund and/or the Board of Trustees of the Pension Fund and/or the Board of Trustees of the Annuity Fund shall each have received from this Employer written notice of termination of this Assent of Participation or until the collective bargaining agreement is nullified between the Employer and the Union.

(Assent of Participation Agreement 2–3, ECF No. 36-10.) Thus, under the terms of the Assent of Participation Agreement, only two events relieve TGB of the obligation to pay contributions: (1)

a written notice of termination of the Assent of Participation Agreement by TGB or (2) nullification of the CBA by the parties.

The Defendants first argue that there were "no agreements binding TGB to make contributions." (Def.'s Mem. for Summ. J. 6, ECF No. 38.) But it is undisputed that TGB signed the 2007 Assent of Participation Agreement and the Trust Agreements, and it is also undisputed that TGB did not send a written notice of termination of the Assent of Participation Agreement. Indeed, there were agreements binding TGB to make contributions to the Funds.

That means the only way for TGB to be relieved of liability earlier than April 2, 2015, the date upon which the Plaintiffs terminated the relationship, is for the Court to find that TGB was not bound by the 2012–15 CBA. The Defendants contend that the 2012–15 CBA is not valid because neither party has produced a signed copy. The Defendants argue that when the 2011–12 CBA expired, TGB was relieved of liability. The Trustees argue, in turn, that the 2012–15 CBA with Local 153 was nullified only when Local 153 disclaimed interest in representing TGB's employees in the April 2, 2015 letter and that whether the parties have produced a signed copy of this CBA is irrelevant because TGB's conduct manifested its intent to be bound by the 2012–15 CBA's terms. Just as it is undisputed that TGB signed the Assent of Participation Agreement in 2007, it is also undisputed that it made contributions to the Funds through 2015, during the operative period of the 2012–15 CBA.

Whether the parties have proffered a signed version of the 2012–15 CBA is not dispositive as to whether it was operative during that period. TGB's conduct belies its argument that it was not bound. It is a "well-established principle that a collective bargaining agreement is not dependent on the reduction to writing of the parties' intention to be bound, rather all that is required is conduct manifesting an intention to abide and be bound by the terms of an

9

agreement." *Bricklayers Local 21 of Ill. Apprenticeship and Training Program v. Banner Restoration, Inc.*, 385 F.3d 761 (7th Cir. 2004) (quoting *Gariup v. Birchler Ceiling & Interior Co.*, 777 F.2d 370, 373 (7th Cir. 1985) and *Capitol-Husting Co. v. NLRB*, 671 F.2d 237, 243 (7th Cir. 1982)) (quotation marks omitted).

TGB followed the provisions of the CBA by paying contributions to the Funds from 2012 through 2014 on its three electricians and continued paying contributions for one of them, Ron Edinburgh, until April 2015. The totality of TGB's conduct unambiguously shows its intent to be bound by the provisions of the CBA.

The Defendant's second argument that the CBA was nullified before the April 2, 2015 letter is that Doug and Cody Curl's resignation letters were "directions to stop making" contributions. (Def.'s Mem. for Summ. J. 8.) And that "to act otherwise would have put TGB in the untenable position of going against the instructions of its employees and risk action being taken by a new employee or by the new Union for the employees possibly engaging in unfair labor practice." (*Id.*) But TGB does not cite to any legal authority for this argument. The letters are not a request that the employer should stop paying contributions on their behalf. The only way to cease contributions is by the method set forth in the Assent of Participation Agreement. An employer is still liable to the benefit funds it contributes to until a termination event occurs. *See Gerber Truck Service, Inc.*, 870 F.2d at 1152–56. And here, Local 153's April 2, 2015 disclaimer of interest is the action that terminated TGB's obligation to pay. Contributions accruing before that date, reflected in the payroll audit, must be paid by TGB to the Funds.

The Defendants also argue that the Trustees "allege a violation only of the Trust Agreement related to the Pension Fund, and not of the other two Trust Agreements. . . ." (Def.'s Mem. for Summ. J. 7–8.) TGB argues that this would limit the Plaintiffs "to recovering for any

10

delinquent contributions to the Pension Fund only." (*Id.*) Assuming the technical thrust of the Defendants' argument, the Trustees do, in fact, allege that TGB failed to contribute to the other funds as well. The Complaint references the payroll audit, which includes the alleged deficiencies of all of the Funds. And the Complaint also includes in the Plaintiff's request for relief, "all amounts owed pursuant to the audit report." (Compl. ¶ B; ECF No. 1.) It is undisputed that the payroll audit provided to TGB includes deficiencies in payments to all the Funds. Additionally, all three Trust Agreements were provided in discovery to counsel for TGB. The Plaintiffs have asserted that their claims are for all amounts owed for all the Funds.

B.     **Adherence to Collection Policy**

The Defendants next argue that TGB is relieved of liability because the Trustees did not strictly comply with the Collection Policy. (Def.'s Mot. for Summ. J. 6–7, ECF No. 38.) The Defendants argue that the Trustees failed to comply with the Collection Policy by billing TGB for the audit deficiency amount fifty-one days after the audit instead of thirty; failing to provide an exit interview or other "opportunity to discuss the audit results as prescribed"; and not affording TGB "a complete appeal or allow TGB to dispute the audit results." (*Id.* at 9.) The Defendants argue that these failures "[s]imply put, . . . did not afford TGB its right to challenge the audit results and have a review of its dispute. Because the Plaintiffs did not follow the dispute process, they are precluded from collecting any amounts they allege are due." (*Id.*) In support, the Defendants cite *Levit v. Ingersoll Rand Financial Corporation (In Re Deprizio)*, 874 F.2d 1186, 1193 (7th Cir. 1989), for the proposition that the terms of the plan documents and CBAs are to be "strictly enforced." "Exactitude works both ways. Just as pension and welfare plans get no less than the agreements provide, so they get no more." *Id.* at 1193.

11

The Defendants are correct that *Levit* stands for the proposition that the Court must strictly enforce the terms of the various agreements between the parties, including the Collection Policy. But the Defendants are incorrect about the remedy. The Defendants' liability is not abated merely because the Trustees allegedly committed the above violations of the Collection Policy. The Defendants have not cited which terms of the Collection Policy, the Assent of Participation Agreement, the Trust Agreements, or the CBAs that characterize these violations as a material breach, for which the contractual remedy constitutes the relief the Defendants seek.

Furthermore, the record reflects many communications between the Funds and TGB over the audit. For instance, Ty Bancroft provided to TIC, at the completion of the Audit Report, the Curls' CLA Union cards, with which he wanted to dispute the audit results. This argument also relies on the letter from Cody Curl asking TGB to stop making contributions. But as discussed above, the letter did not effectuate a termination event that would initiate an audit. That termination event was the disclaimer of interest that occurred when the Trustees sent the April 2, 2015 letter.

Also importantly, the Defendants do not present an argument about how the audit was deficient. The Defendants merely argue that the audit was not conducted in the exact method set forth in the Collection Policy and that because of that violation, they are relieved of liability.

Accordingly, the Court, upon review of the record, finds that any alleged violation of the Collection Policy asserted by the Defendants is not material to the agreements between the parties as to void or abate TGB's liability.

C.      **Bond, Calculation of Damages, and Attorney's Fees Award**

Under the Payroll Audit, TGB failed to pay the required contributions into the Funds from October 2014 through April 2015. (Audit Report 1.) The Audit Report determined that

TGB failed to pay $11,638.40 to all of the Funds from October through November of 2014 and that it failed to pay $21,021.49 to all funds for January through March of 2015. The total contributions claimed are $36,164.40. *Id.*

Under 29 U.S.C. § 1132 (g)(1) and (2), a multiemployer plan that is awarded a judgment under § 515 is entitled to (1) delinquent contributions; (2) interest at the rate specified in the plan; (3) the greater of interest (again) or liquidated damages of up to 20% as specified in the plan; (4) reasonable attorney's fees and costs; and (5) other legal or equitable relief that the court deems appropriate. "ERISA provides for a mandatory award of reasonable attorney's fees when a plan fiduciary prevails in an action to collect delinquent contributions." *Laborers' Pension Fund v. Blackmore Sewer Const., Inc.*, 298 F.3d 600, 608 (7th Cir. 2002) (quoting *Moriarty v. Svec*, 233 F.3d 955, 963 (7th Cir. 2000)). Also, a multiemployer plan may recover audit costs under § 1132(g)(2)(E). *Moriarity ex. rel. Local Union No. 727 v. Svec*, 429 F.3d. 710, 721 (7th Cir. 2005).

The total amount of liquidated damages is $7,232.88 (20% of $36,164.40, the contributions amount listed in the Audit Report). The payroll audit cost is $514.30. Interest continues to accrue. Accordingly, the Court finds TGB liable for the amounts owed less the proceeds from the Contractor's Bond.

Trustees of benefit funds have standing to sue the surety for unpaid contributions. *United States v. Carter*, 353 U.S. 210, 220 (1957). West Bend has not paid bond proceeds to the Funds per its policy regarding ongoing disputes. Accordingly, the Court holds Defendant West Bend Mutual liable for the amount of the bond, $6,500.00.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Plaintiffs' Motion for Summary Judgment [ECF No. 35] and **DENIES** the Defendants' Motion for Summary Judgment [ECF No. 37]. However, because the issues of damages, costs, contractor's bond, and attorney's fees remain ambiguous, the Court **ORDERS** that the Clerk withhold entry of judgment in the case until these issues are fully resolved. The Plaintiffs are directed to file any motion and brief regarding the same, consistent with this opinion, within ten (10) days of the date of this Opinion and Order. The Defendants have ten (10) days thereafter in which to file any response brief. The Plaintiffs will have seven (7) days thereafter to file any necessary reply brief. The Court will take the matter under advisement after briefing is complete.

SO ORDERED on September 28, 2017

s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION